UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **DANE MILLER,** | Case No. _____ |
| **Plaintiff,** | |
| v. | **COMPLAINT** |
| **DRAFTKINGS INC.; AND CASINO QUEEN, INC.,** | JURY TRIAL DEMANDED |
| **DEFENDANTS.** | |

**PRELIMINARY STATEMENT**

1. Plaintiff Dane Miller brings this action for damages caused by Defendants DraftKings, Inc. and Casino Queen, Inc.'s wrongful conduct in connection with the development, design, promotion, advertisement, marketing, and operation of Defendants' online gambling application.

2. Over 2 million adults in the United States are estimated to meet the criteria for a severe gambling problem. Another 5-8 million adults are considered to have a mild or moderate gambling problem. According to the National Institute for Health, the data suggests that these numbers are disproportionately higher in states that permit online sports betting.

3. Until recently, legalized online gambling was unavailable to individuals in the United States. Indeed, most forms of legal gambling were restricted to casinos in a limited number of jurisdictions. In the late 1990s and early 2000's, federal

1

legislation closed the door on online sports betting. However, as general use of and access to the internet grew, operators such as DraftKings saw an opportunity. First, with daily fantasy sports – which DraftKings and others asserted were games of skill (rather than gambling) – and eventually with online and mobile sports books and, later online casionos.

4. Since the legalization of online sportsbooks in 2018, the industry has quickly flourished. Currently, the U.S. sports-betting market has an estimated value of over $17.94 billion and is projected to exceed $30 billion in the next ten years.

5. DraftKings operates one of the largest online sportsbook applications in the United States. In Illinois, DraftKings launched its popular online sportsbook in August 2020. Since its launch, DraftKings has expanded its sportsbook portfolio, features, and marketing.

6. These features include the integration of live sports broadcasts, real-time odds integration, data-driven personalization, in-play betting, and gamified interfaces to attract and retain users. Such features are highly addictive and particularly attractive to "younger demographics who prefer fast, interactive, mobile-first experiences over traditional pre-game wagers."[1] The live, in game betting, now accounts for over 60% of DraftKings' total sportsbook handle.

7. Despite the rapid growth and evolution of the industry, DraftKings is one of many sports-betting operators in a competitive market. With over 4.8 million Monthly Unique Players (MUPs) and extensive competition, DraftKings is highly

---

[1] https://portersfiveforce.com/blogs/target-market/draftkings; last visited April 9, 2026.

2

incentivized to reduce the churn rate (the percentage of customers who cancel or stop using the service in a given period) and maximize retention.

8.      To this end, DraftKings relies heavily on behavioral analytics, secret algorithms, and "hyper-personalized retention efforts" to create a highly addictive product.    Defendants also designed and promoted its product to be particularly attractive to its target demographic: 21-45 year olds and downplayed the risks associated with its product.

9.      These efforts include, but are not limited to, strategic partnerships, localized influencer activations, funnel-tactics, gamification of the product, interactive elements, and the integration and promotion of parlays and micro-bets to extend the "dark flow" of continuous wagering.

10.      These efforts have resulted in a product that is highly addictive and lacking in proper safeguards. Unlike traditional casinos, where staff are trained to monitor specific behavioral markers that suggest problematic gambling (e.g., rapid increases in wagers, chasing losses, extended playing sessions without breaks, etc.), DraftKings ignores any signs of problems and, instead, uses the information it gathers to fine-tune and promote its product, which is available 24 hours a day, 7 days a week in the comfort (and privacy) of one's home, school, car, church, work, etc. Users now have a personalized casino in their back pockets.

11.      Defendants had an obligation to design and market a reasonably-safe product. Defendants breached this duty and, as a result, Plaintiff has suffered significant physical and economic injury.

## PARTIES

### Plaintiff

12.     Plaintiff Dane Miller is a citizen and resident of Cook County, Illinois.

13.     Plaintiff first created an account on DraftKings in 2020 and DraftKings crowned him with VIP status in 2021. DraftKings showered Plaintiff with promotions, incentivized parlay and in-game betting, personalized the product offerings, and provided personal and frequent access to its VIP hosts as a reward for Plaintiff's loyalty and continued business with DraftKings.

14.     DraftKings designed a defective product, placed into in the market, ignored signs of a problem and failed to safeguard Plaintiff.

15.     As a proximate result of Defendants' acts and omissions, Plaintiff suffered significant personal and economic injuries.  Plaintiff accordingly seeks damages associated with these injuries.

### Defendants

16.     Defendant DraftKings, Inc. ("DraftKings") is a Nevada gambling and entertainment corporation headquartered in Boston, Massachusetts, and is a publicly traded company that trades on the Nasdaq Stock Exchange (Nasdaq: DKNG). DraftKings operates in Illinois through a partnership with Casino Queen, Inc., which holds the necessary Master Sports Wagering License to allow mobile wagering in the State of Illinois.

17.     Defendant Casino Queen, Inc. ("Casino Queen") is an Illinois corporation with headquarters in East St. Louis, Illinois. The  real estate investment trust, Gaming and Leisure Properties, owns Casino Queen.  In July 2020, Casino Queen

4

rebranded as "DraftKings at Casino Queen." Casino Queen merged with Bally's Corporation in November 2024 and is now owned by Bally's Management Group, LLC through its holding company Casino Queen, LLC. The sole member of Casino Queen LLC is Bally's Management Group, LLC. Bally's Management Group, LLC is based in Providence, Rhode Island.

18. Bally's Management Group LLC is Delaware–incorporated Company registered in Providence, Rhode Island and is a wholly owned subsidiary of Standard General L.P. Standard General L.P. is a New York–based hedge fund.

19. Casino Queen is integrated with the DraftKings mobile betting app for Illinois users. DraftKings cannot legally operate its mobile product in Illinois without Casino Queen.

## JURISDICTION AND VENUE

20. The Court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states.

21. Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in this district, conduct business in this district, and a substantial part of the acts and omissions giving rise to this complaint occurred in this district.

## RELEVANT FACTUAL BACKGROUND

### History of online sports betting in the United States.

22. For decades, the law curtailed the creation and growth of the online sports betting industry. As a result, an individual needed to travel to a casino in a

jurisdiction that offered legalized sports betting to place a bet in-person. Casual sports betting was often confined to fantasy sports and seasonal play among friends in workplaces, basements and garages. However, as use of the internet and online games gained in popularity, operators such as DraftKings seized upon an opportunity.

23. Initially, the industry focused on a strategy to build an online industry involving fantasy sports, which they categorized as a game of skill rather than gambling – thereby allowing online fantasy sports to circumvent the 2006 Unlawful Internet Gambling Enforcement Act ("UIGEA").

24. In June 2007, Fantasy Sports Live, one of the first daily fantasy sites was launched. Many followed and, in 2012, DraftKings began offering online daily fantasy sports play.

25. By 2015, approximately 57 million people were playing fantasy sports in the United States and Canada, and those numbers have only continued to grow.

26. Today, DraftKings' daily fantasy sports is among the leading providers of online fantasy sports play and is available to users in all but a few states. Although it is considered a game of skill and not "gambling," users may wager money on their teams and, in Illinois, users need only be 18 years old.

27. Daily fantasy sports are immensely popular with adolescents and young adults, which gives DraftKings an important advantage in terms of brand recognition and a head start in turning young people into reliable customers of its online sports betting product.

6

28. Like online sports betting, daily fantasy sports gaming promotes and capitalizes on instant gratification, allowing users to play against thousands of people at an accelerated pace.

29. Studies recognize a link between participation in fantasy sports and participation in more straightforward sports betting. Like DraftKings' online sports betting product, daily fantasy sports offer instant gratification paired with a continuous loop of anticipation and reward – grooming younger users for an eventual transition to the sports betting product. In many respects, fantasy sports are the gateway drug to online sports betting product use and addiction.

30. As the online fantasy sports market flourished, the industry lobbied and litigated in an effort to legalize sports betting in the states. In 2012 and notwithstanding PASPA, New Jersey passed a law legalizing sports betting. After having lost six times in federal court, the American Gaming Association joined New Jersey and, in 2017, brought the case to the U.S. Supreme Court.

31. After extensive litigation, the United States Supreme Court ruled in *Murphy v. National Collegiate Athletic Association*, 138 S. Ct. 1461 (2018), that federal law could not prohibit states from legalizing sports betting within their borders. The race was on.

32. Delaware was the first state to act in response to the Supreme Court's decision and legalized single-game sports betting in June 2018. Momentum has built over the years and, as of March 2026, sports betting has been legalized in thirty-nine states and Washington, D.C. As a result, the market for sports betting has exploded.

According to the American Gaming Association, the U.S. online sports betting industry generated approximately $13.71 billion in revenue and accounted for over 95% of the total sports betting activity in 2024.

33. This rapid expansion of the sports betting industry has fueled a race to recruit new consumers and retain existing users. Online sportsbook operators, including DraftKings, bombarded the market with advertisements and promotions to capture valuable market share and designed a product, which entices inexperienced and/or younger gamblers, to prolong engagement, compound the risk, and increases the risk of addiction. At the same time, DraftKings downplayed and/or concealed the risks associated with the product.

34. Online sports betting is big business, and statistics indicate that approximately half of men ages 18 to 49 have an active account with an online sportsbook.

35. As the market has expanded, so too have Defendants' offerings and incentives. However, as the market has expanded, so have the problems and injuries associated with Defendants" product. Several states, help lines and researchers report increases in the calls for help, signs of distress, and rapid rise in gambling addiction diagnoses – particularly in young adults and men. Experts have sounded the alarm and expressed concern for the growing epidemic and public health crisis.

**The science behind disordered gambling and addiction.**

36. To understand the addictive impact of Defendants' product and their role in causing gambling addiction, one must consider the interaction among the

human brain, dopamine, online gambling, and the user interface inherent in Defendant's product.

37.     The frontal lobes of the brain—particularly the prefrontal cortex—control higher order cognitive functions. This region of the brain is central to self-regulation, planning and executive decision-making, including the evaluation of risk and reward.

38.     Because of its involvement in complex cognitive functions, the prefrontal cortex is slow to develop.  Several factors influence this development, including environmental and social experiences. However, this area of the brain is not  well developed until the mid-to-late 20's, and the neural networks of the brain continue to become more specialized and efficient into one's 30's.

39.     Because of the immaturity of the prefrontal cortex, teens and young adults have less impulse control, and less ability to regulate their responses to social rewards and stimuli.

40.     Dopamine also plays a key role in brain development and is a neurotransmitter that is central to the brain's reward system.

41.     During this developmental phase, the brain learns to seek out stimuli (e.g., gambling) that result in a reward (e.g., winning) and cause dopamine to flood the brain's reward pathways. Each time this happens, associations between the stimulus and the reward become stronger and the anticipation of a reward can itself trigger a dopamine rush.

42.     Manipulation of dopamine interferes with the brain's development and can have long-term impacts on an individual's memory, affective processing, reasoning, planning, attention, inhibitory control, and risk-reward calibration.

43.     Moreover, repeated spikes of dopamine over time may cause one to build up a tolerance for the stimulus. In this process of "neuroadaptation," the production of dopamine and the sensitivity of dopamine receptors are both reduced. As a result, the individual requires more and more of the stimulus to feel the same reward. This cycle can cause decreases in activity in the prefrontal cortex, leading to further impairment of decision-making and executive functioning.

44.     This is particularly important when examined under the lens of online sports betting. For example, researchers have found that dopamine plays a central role in reward uncertainty, a key element of sports betting.[2]  With time, the dopamine system becomes activated simply by placing a bet, regardless of whether one wins or loses.  Similarly, near-miss outcomes (often seen in a parlay) fuel cognitive distortions that result in overstimulation and enhance dopamine transmission.[3]

45.     In sum, online sports betting, particularly in forms designed to simulate near-misses or rapid and extended play, trigger massive releases of dopamine, which creates a tolerance and leads the individual to engage in more and riskier behavior to get the same "fix" – similar to drug and other forms of addiction.

---

[2] https://www.vchri.ca/stories/2025/08/22/ask-expert-what-are-some-signs-gambling-starting-affect-my-brain-health#:~:text=A:%20A%20core%20feature%20of,to%20develop%20more%20effective%20treatments.
[3] https://pmc.ncbi.nlm.nih.gov/articles/PMC2929454/

46. Further, the need for riskier and more frequent gambling can weaken the connection between the brain's reward center and the prefrontal cortex, making it increasingly more difficult to stop gambling, even when facing significant losses.

47. This interference with dopamine and impact on the brain is further compounded by a host of gambling cues integrated into Defendants' product, including frequent push notifications, as well as visits and calls from VIP hosts, etc. These cues are designed, and proven, to trigger intense, automatic cravings and resulting in increased urges, reward distortion, and desensitization. This results in a vicious cycle and leads to gambling disordered addiction and serious injury.

**Gambling disorder and addiction lead to significant injury.**

48. Gambling Disorder (GD) was added to the *The DSM - Diagnostic and Statistical Manual of Mental Disorders* (Fifth Edition) ("DSM-5") as a Substance-Related and Addictive Disorders in 2013. It is the only behavioral addiction recognized in the DSM-5.

49. GD has been referred to as a "model behavioral addiction" with similarities to substance use disorders. Like addictions to heroin, cocaine, or tobacco, GD involves dysregulation of dopamine pathways, altered reward processing, and impaired cognitive control.

50. GD is marked by multiple symptoms, including but not limited to, chasing losses, lying, or significant disruption of daily life. The DSM-5 defines GD as persistent gambling that causes distress or impairment, marked by loss of control, preoccupation, and continued gambling despite harm.

51.     The DSM-5 goes on to outline nine indicators of GD, only 4 of which need be present in a 12-month period:

    a.  Preoccupation with gambling;

    b.  Increasing the amounts wagered;

    c.  Unsuccessful attempts to stop or control gambling;

    d.  Restlessness or irritability when attempting to stop gambling;

    e.  Gambling as an escape from problems or negative mood;

    f.  Chasing losses;

    g.  Risking relationships, employment, or education because of gambling;

    h.  Lying to conceal the scope of gambling; and

    i.  Financial desperation and/or reliance on others or non-conventional sources of funds to gamble.

52.     While a risk of financial loss may seem obvious in gambling, the risks and harms associated with gambling disorder extend far beyond traditional notions of a gambling loss. GD and addiction can damage relationships, destroy careers, drive crime, and result in significant mental, emotional and physical harm.

53.     Notably, GD is associated with an increased risks of suicide, with over 30% of people with GD reporting lifetime suicidal idea. Further, studies that have examined this issue have found a significant association between gambling and suicide ideation, attempts, and mortality. Problem gamblers are almost twice as likely to experience suicidal ideation compared to those without gambling problems,

and the relative risk goes up significantly with respect to suicide mortality. Higher scores on the Problem Gambling Severity Index (PGSI) also correlate with higher odds of suicide attempts.

54. Other physical manifestations of GD include, but are not limited to, substance abuse, depression, anxiety, chronic stress, hypertension, hypertension, heart disease, and ulcers.

55. Studies have also shown that sports betting, when compared to non-sports gambling, is more strongly linked to cognitive distortions and amplified risk of addiction. For example, sports betting has been more strongly linked to GD and cognitive distortions related to illusions of control. Similarly, in-play betting has been associated with greater impulsivity and problem-gambling severity. Lastly, biases built in to the online sports betting product (e.g., win/loss ratios, perceptions of skill, etc.) contributes to both maintaining and increasing the severity of disordered gambling behaviors.

56. As discussed, *infra*, Defendants purposefully exploited the cognitive distortions, biases and perceptions to design and promote a product that was highly addictive and dangerous.

**DraftKings employs complex analytical tools, algorithms, and databases to enhance its product and increase addiction.**

57. Shortly after the 2018 United States Supreme Court opinion reversing the ban on online sports betting, DraftKings entered into a multi-year agreement with Kambi Group plc ("Kambi") to provide technology and services.

58. However, the partnership with Kambi was short lived and, in late 2019, DraftKings announced plans to merge with sports-betting and gaming technologies company SBTech. Through this merger, SBTech provided DraftKings with an "in-house technology platform needed to transition from a daily fantasy sports company into a vertically integrated, publicly traded sports betting powerhouse."

59. The merger allowed DraftKings to own its tech stack, rather than lease it. SBTech provided technology, in-game betting options, and improved access to innovation – including tailored user experiences. SBTech was also active in the European sports betting market.

60. Diamond Eagle Acquisition Corp. facilitated the merger between SBTech and DraftKings, which became effective in April 2020.

61. Following the merger, DraftKings migrated its sportsbook technology to the SBTech platform. SBTech provides the core technology solutions powering DraftKings' sports betting and online gaming product.

62. DraftKings describes SBTech as an "international turnkey provider of cutting-edge sports betting and gaming technologies."

63. The technologies employed by DraftKings are complex and designed to quickly process massive amounts of data, manage high volumes of traffic, and provide users with a seamless experience – including a single pay "wallet" which enables users to "instantly move funds between DFS, Sportsbook, and Casino."

64. This technological ecosystem includes, but is not limited to data sciences, machine learning, databases, and analytical tools.

65. DraftKings also utilizes a suite of "tech stacks" to enhance the user experience by processing real-time data feeds and messaging. The vertical integration also allows for "rapid deployment of features like live same-game parlays."

66. Defendants optimize these tech stacks for speed, including micro services, caching and auto-scaling. Examples of such tech stacks include but are not limited to Tableau, Firebase, NetCore, Kafka, NodeJS, ReactJS, RabbitMQ, MassTransit, Apache Flink, Swift, Kotlin, and Kubernetes.

67. Technologies such as GitOps, Prometheus, Grafana and ElasticSearch are also used for management and monitoring of the infrastructure.

68. Additionally, DraftKings relies on both relational and NoSQL databases to store user data, betting history, game statistics, and other information.

69. Collectively, the web of databases, tech stacks, and analytics allows DraftKings to auto-scale, simulate game-day surges, and provide live dashboards that are responsive in real-time. Defendants integrate this technology into their product and it is part of the overall business strategy to attract and retain users, maximize engagement, and minimize churn.

70. DraftKings also collects extensive data on individual users. This data includes personal identifying information, but extends far beyond basic account information to geolocation, device and usage patterns, behavioral and profiling analytics, and social interaction data.

71. While some level of data collection is necessary for compliance, security, and fraud prevention, Defendants collect and deploy massive amounts of data to

15

create and design a user interface that taps into the specific preferences and behaviors of the individual user– and to facilitate DraftKings' rapid expansion of its online sportsbook business and product sales.

72. What the end user does not see or factor into their activity is the game behind the game. These technological advancements in algorithmic personalization influence behavior in ways that are dangerous for the user. These personalized algorithms reinforce illusions of control, buttress loss aversion, and encourage the user to chase their losses. Additionally, by using personal analytics, Defendants' product anticipates a user's exact moment of "emotional vulnerability" and provides "personalized stimuli" precisely timed to maintain engagement.

73. These algorithms also prey on the cognitive distortions, or biases, experienced by sports bettors and other gamblers. This results in users overestimating their skill and the probability of winning, which leads to increased engagement and a continual loop of chasing losses, which is a hallmark of the transition from recreational to disordered gambling.

74. Not unlike social media and video gaming, the sophisticated algorithms incorporated into the design of DraftKings' app, constitute a product[4] that "create[s] a repetitive cycle of anticipation and reward that can lead to conditioned psychological dependence." Further, DraftKings' exploitation of personal data to

---

[4] Additionally, Defendants frequently refer to their "Sportsbook product" on their webpage. *See, e.g.*, What Is Sportsbook? | DraftKings Careers, last visited June 23, 2026. ("DraftKings' Sportsbook is the first fully integrated sports betting product in the US, meaning there's no third-party dependencies.") ("Our teams put in a lot of hours to ensure we have a unique, immersive, and best-in-class product.")

influence algorithms and, ultimately, betting behavior, provides the user with a false sense of autonomy and increased risk of addiction.

75. By contrast, European regulators limit the use of personal data and automated systems in online gambling platforms. In Europe, gambling applications are considered high-risk, and subject to strict requirements regarding transparency and algorithmic auditability requirements.

76. DraftKings previously secured licenses to offer Daily Fantasy Sports in Austria, Germany, Ireland, and Malta – as well as the United Kingdom. However, DraftKings ceased all operations in the European and UK markets – citing a business optimization strategy and desire to focus on higher-margin areas, like the United States.

77. Here, DraftKings' ability to leverage its online digital infrastructure, surveillance data, and behavioral analytics has equipped DraftKings with an unparalleled ability to target consumers, engage users and prolong engagement. Coupled with aggressive marketing, personalized promotions, rapid play, and inadequate safeguards, this creates a recipe for disaster.

### DraftKings designed its product to be addictive.

78. As of 2024, DraftKings has over 4.8 million Monthly Unique Users, which reflects an increase of more than double over a 3-year period. A significant percentage (65%) of these Monthly Unique Users fall into DraftKings' core target market of young adults age 21-45.

17

79. Much of this "success" is attributed to DraftKings' efforts to hook customers and secure repeat business through the aforementioned analytics and algorithms, in addition to various engagement tools, which collectively create an interface that is marketed throughout the state of Illinois and elsewhere. Further, Defendants designed the interface in a manner that remains a secret to the end-user, including Plaintiff.

80. Defendants also relied on various tools and tactics to increase engagement and further the user interface. These tools include promotions that suggest low or risk-free offers that are designed to increase engagement through gamification, parlays, and interactive participation, often via in-play betting–elements that are particularly attractive to younger users, who are both within DraftKings' target market and the group most susceptible to gambling disorder and addiction.

81. Additionally, DraftKings rewards its high-value users with additional perks, such as personalized attendants, exclusive communication options, professional sporting event tickets, etc. – all designed and personalized based on a user's behavioral analytics. Collectively, the design of DraftKings' product makes it easy to start, but difficult to stop, gambling.

82. Of course, not all forms of gambling carry the same risks. According to the National Council on Problem Gambling, "the rate of gambling problems among sports bettors is at least twice as high as among gamblers in general. When sports gambling is conducted online, the rate of problems is even higher, with one study of

online sports gamblers indicating that 16% met clinical criteria for gambling disorder and another 13% showed some signs of gambling problems."

83.    Several factors make online sports betting distinct from, and more addictive than traditional forms of gambling. Online sports betting allows for continuous and immediate access as well as enabling the user to wager in complete privacy. Also, parlay and in-game betting features compound the problem by shortening the lag between bet and reward and increasing the speed and frequency of gambling – all of which increases the risk of problematic behavior.

84.    The fast pace and immersive nature of certain forms of gambling lead some players to become completely absorbed in the product.  This is often referred to as the dark flow of gambling.

85.    Increasingly, sports betting has taking on similar characteristics – fast play and immersive experiences, particularly in parlays and in-play betting, features which DraftKings actively promotes.

86.    These features are not accidental. They are deliberate design choices informed by data, science, and behavioral psychology and they are at the core of the user interface and, ultimately, the product at issue here.

87.    Coupled with DraftKings' ability to track betting activity and user interactions in incredible detail, as well as the user-specific design and manipulation of the algorithms, the fast-paced parlay and in-play betting have become particularly popular – and dangerous.  Notwithstanding, DraftKings has established itself as a

market leader in same-game parlay (SGP) and multi-leg betting, making it a central feature of the sportsbook experience.

88.     A parlay is often seen as the holy grail of sports betting. The concept is simple: combine multiple bets into one ticket for a massive payout. Parlays combine two or more individual picks into a single bet.  To win on a parlay, an individual needs to win all legs of the parlay.

89.     While the user may perceive a better payout with a parlay, the reality is they are far less likely to win. As a result, parlays are more profitable for DraftKings. Barrons reports that "the companies' average 'win margin'—the amount they keep from bets—is about 20% on [parlay] bets, versus 5% for a standard bet on a single outcome in baseball or football."

90.     Further, "parlays now account for more than 60% of the total number of online sports bets that people make each month and more than 27% of the money wagered" in Illinois.[5]

91.     Disordered gamblers who form, or feed, their addiction via parlays often obsess over upcoming games and odds, chase losses by increasing bets, hide their gambling behavior from loved ones, borrow money or neglect bills in lieu of placing sports bets, and experience anxiety or depression when not gambling.[6]

---

[5] See https://www.barrons.com/articles/draftkings-flutter-stock-sports-gambling-parlay-bet-25914b0f, last visited Apr. 9, 2026.
[6] *Id.*

92. With a focus on the lucrative parlay market, DraftKings doubled down on parlays with targeted promotions and incentives. It even sold merchandise capitalizing on the popularity of the parlay.

93. Similarly, DraftKings aggressively promotes its in-game live betting option and a subtype of the in-game bet known as a micro-bet or "flash bet," which is particularly popular with its target demographic – and excessively risky as such bets require increased impulsivity and can lead to greater severity in problem gambling.

94. In-play bets present hundreds of opportunities to place wagers during a single event in rapid succession.

95. This form of in-play betting relies on game speed and frequency, which not only encourages the rapid placement of bets, but also exaggerates the perception of reward and reinforces risky behavior – all while maximizing engagement - key features in the progression to gambling disorder and addiction.

96. DraftKings launched in-play micro-betting after partnering with Simplebet in 2021. As a result, DraftKings has the most "granular micro-betting market" in the industry. "DraftKings offers live betting play-by-play, pitch-by-pitch, and more during NFL, MLB, NBA, and college football games… even offering wagers on the speed of the next pitch during MLB games."[7]

97. Micro-betting enables rapid, impulsive and continuous betting; it is also attractive to younger and more engaged bettors. The defining feature of in-play and micro bets is the shorter interval between placing bets and the outcome; it also taps

---

[7] https://www.bettingusa.com/sports/microbetting/ (last visited Apr. 10, 2026).

into a seemingly infinite number of micro-events through which the user can wager, win/lose, and immediately re-wager leading to a continuous loop of betting – and higher problem gambling scores.

98. DraftKings designed its product to facilitate continuous and repetitive engagement through a variety of tools. These include the afore-mentioned parlay and in-play betting, but also include integration of social media networks, gamification of sports betting, promotions for risk free bets, instant deposits, wagering inducements, push notifications on smartphones, and lucrative VIP programs. While each is problematic in its own right, collectively these design features result in a defective product that leads to disordered gambling and addiction.

**DraftKings downplayed the risks and dangers of its product.**

99. DraftKings fails to adequately warn of the risks and dangers of inherent in its product, particularly with respect to the parlay and/or in-game microbets. Further, DraftKings, at best, downplays the heightened risks associated with its product by marketing itself as the "safest sports betting platform" and touting a commitment to "responsible gaming."

100. DraftKings's responsible gaming page on its website and mobile application welcome users with the tagline, "It's more fun, when it's for fun." It also includes links with pages for Sports betting 101, How to Play Casino Games, and How to Play Horse Racing.

101. DraftKings also collaborated with numerous influencers and sponsored marketing materials that were either silent on or downplayed the risks associated with its product.

102. Defendants also pushed a variety of promotions, including a "no-sweat bet" and similar campaigns that belie any warnings or cautionary language Defendants may have placed on the app or in the fine print.

103. Further, Defendants' collection of personal data, while used for marketing, reasonably placed Defendants on notice of potential disordered gambling in consumers, including Plaintiff.

104. Notwithstanding, Defendants place all of the onerous on the Plaintiff to identify problematic gambling or potential signs of addiction. However, research demonstrates that consumers are often unable to ascertain the risks associated with a product, particularly when addictive elements of the product are concealed.

105. After exposure to DraftKings' products, commercials, promotions, and advertisements, consumers (including Plaintiff) reasonably believed that DraftKings employed appropriate safeguards. Plaintiff and others relied on these representations to their detriment.

**DraftKings failed to implement appropriate safeguards.**

106. DraftKings designed its product to disincentive users from not only disengaging, but also discontinuing use. To this end, DraftKings either failed to implement available safeguards, and/or ignored signs of disordered gambling in certain users.

107. Examples of safeguards that DraftKings elected not to use include but are not limited to reducing barriers to withdrawal of funds; establishing deposit and/or spending limits tied to income verification; capping the use of parlays, in-game bets and micro-betting; controlling inducements such as "no-sweat bets" and "odds boosts"; disabling personalized offers based on algorithms; removing or un-assigning VIP hosts; and restricting marketing to certain age groups and during live games.

108. As previously discussed, DraftKings collected and used massive amounts of personalized data and analytics to drill down on an individual user's gambling patterns, uses, and triggers. DraftKings could have easily utilized similar data and algorithms to screen and detect problematic gambling behavior, but failed to do so.

109. Indeed, it is well accepted that certain behaviors are markers of at-risk play – and many of these behaviors were easily identifiable, if not tracked, by DraftKings. Examples of such behaviors include but are not limited to, deposits exceeding $10,000.00 in 24 hours or $100,000.00 in 90 days; multiple visits to self-exclusion pages without self-excluding; regularly increasing deposit or loss limits; frequently placing and then canceling withdrawal requests without actually cashing out; turning over $1 million or more in bets over 90 days; logging in 50% more than was typical in the prior weeks; and ending several sessions in a week with larger wagers than the last session.

**DraftKings' defective product caused Dane Miller's Addiction.**

110. Plaintiff Dane Miller is a citizen and resident of Platine, Illinois. He is currently 32 years old.

111. Miller was a casual fantasy sports player before Illinois legalized online sports gambling and, once legalized in Illinois, Miller played recreationally.

112. Enticed by lucrative sign-on bonuses and credits, Miller opened an account with DraftKings on or about October 1, 2020. Miller was 26 years old at the time.

113. Despite initially starting with small wagers and straight bets, the number and volume of wagers Miller placed on DraftKings quickly escalated – particularly as Miller transitioned into parlays and live betting. During this time, DraftKings would send Miller push notifications and offer a live feed of various sporting events where Miller could bet on plays, pitches, and other events in real time. The constant prompts, access, and live-feeds, along with the rapid-fire pace of bets and the personalized attention directed to Miller, fueled an addiction that eventually consumed all aspects of Miller's life.

114. DraftKings quickly realized the potential in Miller and crowned him as a VIP in May 2021. As a VIP, DraftKings showered Miller with many lucrative "perks" including but not limited to promotions, profit boosts, free bets, DK cash, deposit matches, and tickets to professional sporting events.

115. DraftKings also provided Miller with multiple personal VIP hosts who flooded Miller's phone and inbox with emails, calls and texts offering additional perks and encouraging further gambling. For example, after gambling away the money he had saved for his wedding, one of Plaintiff's DraftKings VIP hosts offered Miller two tickets to a suite at Soldier Field in recognition of his continued loyalty to DraftKings.

116. Miller reached a point where he communicated with his VIP host daily. During these communications, Miller frequently requested things like free bets and promos, etc., anything to facilitate continued gambling and use of DraftKings' online sportsbook product.

117. In total, Miller placed over $2 million dollars in wagers through the DraftKings platform.

118. During this same time, Miller's life began to unravel. Miller secured personal loans, credit cards, 401k loans, and used his wedding money to fund his frequent online sports betting. In September 2024, Miller's employer determined that Miller's constant sports betting was a problem and terminated his employment.

119. Miller's father began to see signs of trouble and, in September 2024, asked Miller to self-exclude through the State of Illinois. Miller declined.

120. On October 16, 2024, at the pinnacle of Miller's addiction, DraftKings sent Miller five, $200 sportsbook credits to use on its platform.

121. Less than two weeks later, on October 29, 2024, Miller wrote a suicide note and was admitted to Northwest Community Hospital with suicidal ideation. Doctors diagnosed Miller with severe gambling disorder, anxiety, and depression.

122. Miller was discharged from the hospital on approximately November 5, 2024. He quickly relapsed and restored the DraftKings app to his phone.

123. Miller was subsequently admitted to an intensive outpatient treatment program, which he completed in December 2024. After successfully completing his treatment, Miller self-excluded in Illinois on December 21, 2024.

124. Miller has sustained, and continues to sustain, significant physical injury and economic harm as a result of DraftKings' defective product.

## Equitable tolling of statute of limitations

125. Through the exercise of reasonable diligence, Plaintiff did not and could not have discovered that DraftKings' product caused his injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiff.

126. Plaintiff did not suspect and had no reason to suspect DraftKings' product caused his injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

127. Due to the highly technical nature of the platform's features, Plaintiff was unable to independently discover that DraftKings' product caused his injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

128. Defendants had exclusive knowledge of the material defects designed and implemented into their platform, and they have at all times through the present maintained their proprietary designs of their platform's features as strictly confidential.

129. In addition, Defendants' fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

130. Defendants had a duty to disclose dangerous and defective features that cause foreseeable harm to its users. Specifically:

a. Defendants knew that a small percentage of users generate a disproportionate share of revenue;

b. Defendants knew how to identify high-risk users through betting velocity, loss-chasing, overnight play, and other metrics;

c. Defendants knew that targeted incentives can worsen addictive behavior; and

d. Despite this knowledge, Defendants' systems are designed to accelerate, not interrupt, compulsive betting.

131. Defendants knowingly, affirmatively, and actively concealed from Plaintiff the risks associated with the defects of Defendants' product and that the products caused his injuries.

132. Defendants committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, Defendants still have not disclosed, and continues to conceal, that they designed and implemented dangerous features into their product. Despite their knowledge of the defects and their attendant safety risks, Defendants continue to market their product to users while simultaneously omitting the disclosure of known and foreseeable harms to users.

133. Plaintiff was unaware and could not have reasonably known or learned through reasonable diligence that he had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

134. For the foregoing reasons, Defendants are estopped from relying on any statutes of limitation or repose as a defense in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by Defendants' active concealment with respect to all claims against Defendants.

**Claim 1: Strict Liability Design Defect**

135. Plaintiff incorporates by reference the above paragraphs as if set forth herein.

136. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from Plaintiff's use of its product.

137. Defendants' product is designed and intended to be used for gambling, including online sports betting.

138. Defendants' product is distributed and sold to the public through retail channels (i.e., the Apple App "Store" and the Google Play "Store") and made available to Plaintiff and others in Illinois through Casino Queen, Inc.

139. Defendants' product is marketed and advertised to the public for the personal use of the end-user / consumer.

140. Defendants defectively designed the product to addict young adults and vulnerable gamblers, who were particularly unable to appreciate the risks posed by the product, and particularly susceptible to harms from the product.

141. The defects in the design of the Defendants' product existed prior to the release of the product to Plaintiff and the public, and there was no substantial change to the Defendants' product between the time of their upload by Defendants to public or retail channels (e.g., the App Store or Google Play) and the time of their distribution to Plaintiff via download or URL access.

142. Plaintiff used the product as intended, and Defendants knew or, by the exercise of reasonable care, should have known that Plaintiff would use the product without inspection for its addictive nature.

143. Defendants defectively designed its product to take advantage of the chemical reward system of users' brains (especially young users) to create addictive engagement, compulsive use, and additional mental and physical harms.

144. Defendants' product is defective in design and poses a substantial likelihood of harm for the reasons set forth herein, because the product fails to meet the safety expectations of ordinary consumers when used in an intended or reasonably foreseeable manner, and because the product is less safe than an ordinary consumer would expect when used in such a manner. Young men are among the ordinary consumers of Defendants' product. Indeed, Defendants market, promote, and advertise their product to young consumers. Young consumers do not expect Defendants' product to be psychologically and neurologically addictive when the product is used in its intended manner by its intended audience. They do not expect the algorithms and other features embedded by Defendants in their product to make them initially and progressively more stimulative, to maximize young consumers' usage time. They do not expect Defendants' revenues and profits to be directly tied to the strength of this addictive mechanism and dependent on young consumers spending several hours a day using their respective product and continuing to gamble.

145. Defendants' product is likewise defectively designed in that it creates an inherent risk of danger; specifically, a risk of abuse, addiction, and compulsive use by young adults that can lead to a cascade of harms. Those harms include but are not limited to economic loss, dissociative behavior, withdrawal symptoms, social isolation, damage to self-worth, increased risky behavior, and profound mental health issues for young consumers including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, death, and other harmful effects.

146. The risks inherent in the design of Defendants' product significantly outweigh any benefit of such design.

147. Defendants could have utilized cost-effective, reasonably-feasible alternative designs including algorithmic changes and changes to the addictive features described above, to minimize the harms described herein, including, but not limited to:

   a.  Warning of health effects of use and extended use upon sign-up;

   b.  Default protective limits to the length and frequency of sessions;

   c.  Opt-in restrictions to the length and frequency of sessions;

   d.  Self-limiting tools, including but not limited to session time notifications, warnings, or reports;

   e.  Redesigning algorithms to limit rather than promote addictive engagement;

   f.  Limits on the strategic timing and clustering of notifications to lure back users; and

148. Removing barriers to the deactivation and deletion of accounts. Alternative designs were available that would reduce users' addictive and compulsive

engagement with Defendants' product, and that would have served effectively the same purpose of Defendants' product while reducing the gravity and severity of danger posed by the product's defects.

149. Plaintiff used Defendants' product as intended or in reasonably foreseeable ways.

150. The physical, emotional, and economic injuries of Plaintiff were reasonably foreseeable to Defendants at the time of their product's development, design, advertising, marketing, promotion, and distribution.

151. Defendants' product was defective and unreasonably dangerous when it left Defendants' respective possession and control. The defects continued to exist through the product's distribution to and use by consumers, including Plaintiff, who used the product without any substantial change in the product's condition.

152. Plaintiff was injured as a direct and proximate result of Defendants' defective designs as described herein. The defective design of the product used by Plaintiff was a substantial factor in causing harm to Plaintiff.

153. As a direct and proximate result of Defendants' product's defective design, Plaintiff suffered, and continues to suffer, serious and dangerous injuries. Those injuries have required and will require more healthcare and services and did incur medical, health, incidental, and related expenses. Plaintiff's injuries are permanent and ongoing.

154. Plaintiff demands judgment against Defendants for all damages allowed by law, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**Claim 2: Strict Liability Failure to Adequately Warn**

155. Plaintiff incorporates by reference the above paragraphs as if set forth herein.

156. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its product used by Plaintiff.

157. Plaintiff was a foreseeable user of Defendants' product.

158. Defendants' product is distributed and sold to the public through retail channels (e.g., the Apple App "Store" and the Google Play "Store").

159. Defendants sold and distributed its product to Plaintiff in a defective and unreasonably dangerous condition by failing to adequately warn about the risk of harm to young adults as described herein, including a risk of abuse, addiction, and compulsive use, which can lead to a cascade of related injuries. Those injuries include but are not limited to economic losses, dissociative behavior, withdrawal symptoms, social isolation, damage to self-worth, and profound mental health issues for young consumers including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, death, and other harmful effects.

160. Defendants' product is dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' product, because it encourages unhealthy, addictive engagement and compulsive use.

161. Defendants knew or, by the exercise of reasonable care, should have known that their product posed risks of harm to young adults considering its own internal data and knowledge regarding its product at the time of development, design, marketing, promotion, advertising, and distribution.

162. Defendants' product is defective and unreasonably dangerous because, among other reasons described herein, Defendants failed to exercise reasonable care to inform users that, among other things:

   a. Defendants' product causes addiction, compulsive use, and/or other concomitant physical and mental injuries;

   b. Defendants' product harvests and utilizes user data in such a way that increases a user's risk of addiction to the product and concomitant physical and mental injuries;

   c. The algorithmically-targeted feeds in Defendants' product are designed to promote increasingly stimulative content to encourage compulsive engagement by the user, raising the risk of economic loss and mental health harms including but not limited to depression, self-harm, and suicidal ideation;

d.  New users of Defendants' product can begin to use the product, and do so indefinitely, without any time or usage limitations, without ever receiving a safety warning; and

e.  The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another, and by algorithms and other source code design that is currently publicly unknown and hidden from the users and the government.

163. Ordinary users would not have recognized the potential risks of Defendants' product when used in a manner reasonably foreseeable to Defendant.

164. Had Plaintiff received proper or adequate warnings or instructions as to the risks of using Defendants' product, Plaintiff would have heeded the warnings and/or instructions.

165. Defendants' failure to adequately warn Plaintiff about the risks of its defective product was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

166. The nature of the unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' product. When Plaintiff used Defendants' product, he was not independently able to verify whether Defendants' product continues to pose an unreasonable risk or rely on Defendants' representations in the future.

167. The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an

entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

168. Plaintiff demands judgment against Defendants for all damages allowed by law, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Claim 3: Negligent Design

169. Plaintiff incorporates by reference the above paragraphs as if set forth herein.

170. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its product used by Plaintiff.

171. Defendants' product was designed and intended to be an addictive sports betting application.

172. Defendants knew or, by the exercise of reasonable care, should have known, that their product was dangerous, harmful, and injurious when used by young adults in a reasonably foreseeable manner.

173. Defendants knew or, by the exercise of reasonable care, should have known that their product posed risks of harm to young adults. These risks were known and knowable in light of Defendants' own internal data and knowledge

regarding its product at the time of the product's development, design, marketing, promotion, advertising, and distribution to Plaintiff.

174. Defendants knew, or by the exercise of reasonable care, should have known, that ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of Defendants' product. Those risks include abuse, addiction, and compulsive use in young adults, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to self-worth, and profound mental health issues including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, and death.

175. Defendants owed a duty to all reasonably foreseeable users to design a safe product.

176. Defendants owed a heightened duty of care to young adult users of its product because young adult's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of usage.

177. Defendants breached their respective duty in designing its product.

178. Defendants breached their respective duty by failing to use reasonable care in the design of its product by negligently designing it with features and algorithms as described above that specifically are addictive and harmful to young adults, who are particularly unable to appreciate the risks posed by the product.

179. Defendants breached their respective duty by designing a product that was less safe to use than an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

180. Defendants breached their respective duty by failing to use reasonable care in the design of its product by negligently designing its product with features and algorithms as described above that created or increased the risk of abuse and addiction in young adults, which can lead to a cascade of negative effects including but not limited to dissociative behavior, withdrawal symptoms, social isolation, damage to self-worth, and profound mental health issues including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, death, and other harmful effects.

181. Defendants breached their respective duty by failing to use reasonable care to use cost-effective, reasonably feasible alternative designs, including algorithmic changes and changes to the addictive features described above, and other safety measures, to minimize the harms described herein. Alternative designs that would reduce the addictive features of Defendants' product were available, would have served effectively the same purpose as Defendants' defectively designed product, and would have reduced the gravity and severity of danger Defendants' product posed to young adults, including Plaintiff.

182. A reasonable company under the same or similar circumstances as Defendants would have designed a safer product.

183. At all relevant times, Plaintiff used Defendants' product in the manner in which it was intended by Defendants to be used.

184. As a direct and proximate result of Defendants' breached duties, Plaintiff was harmed and continues to suffer harm. Defendants' design of their product was a substantial factor in causing the Plaintiff's harms and injuries.

185. The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

186. The nature of the unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' product. When Plaintiff used Defendants' product, he was not independently able to verify whether Defendants' product continued to pose an unreasonable risk or rely on Defendants' representations in the future.

187. The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

188. Plaintiff demands judgment against Defendants for all damages allowed by law, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**Claim 4: Negligent Failure to Warn**

189. Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

190. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its product used by Plaintiff.

191. Plaintiff was a foreseeable user of Defendants' product.

192. Defendants' product is distributed and sold to the public through retail channels (e.g., the Apple App "Store" and the Google Play "Store").

193. Defendants owed a heightened duty of care to young adult users of its product because young adult's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of social media usage.

194. Defendants breached their respective duty to Plaintiff by failing to adequately warn about the risk of harm to young adults as described herein, including a risk of abuse, addiction, and compulsive use which can lead to a cascade of harms. Those harms include but are not limited to economic losses, dissociative behavior, withdrawal symptoms, social isolation, damage to self-worth, and profound mental health issues for young consumers including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, death, and other harmful effects.

195. Defendants' product is dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' product, because it encourages unhealthy, addictive engagement and compulsive use.

196. Defendants knew or, by the exercise of reasonable care, should have known that their product posed risks of harm to young adults considering its own internal data and knowledge regarding its product at the time of development, design, marketing, promotion, advertising, and distribution.

197. Defendants' product is defective and unreasonably dangerous because, among other reasons described herein, Defendants failed to exercise reasonable care to inform users that, among other things:

  a. Defendants' product causes addiction, compulsive use, and/or other concomitant physical and mental injuries;

  b. Defendants' product harvests and utilizes user data in such a way that increases a user's risk of addiction to the product and concomitant physical and mental injuries;

  c. The algorithmically-targeted feeds in Defendants' product are designed to promote increasingly stimulative content to encourage compulsive engagement by the user, raising the risk of economic loss and mental health harms including but not limited to depression, self-harm, and suicidal ideation;

  d. New users of Defendants' product can begin to use the product, and do so indefinitely, without any time or usage limitations, without ever receiving a safety warning; and

  e. The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another, and by algorithms and other source code design that is currently publicly unknown and hidden from the users and the government.

198. Ordinary users would not have recognized the potential risks of Defendants' product when used in a manner reasonably foreseeable to the Defendant.

199. Had Plaintiff received proper or adequate warnings or instructions as to the risks of using Defendants' product, Plaintiff would have heeded the warnings and/or instructions.

200.    The Defendants' failures to adequately warn Plaintiff about the risks of its defective product was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

201.    The injuries of Plaintiff cannot be wholly remedied by monetary relief and such remedies at law are inadequate.

202.    The nature of the unlawful acts that created safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' product. When Plaintiff used Defendants' product, he could not independently verify whether Defendants' product posed an unreasonable risk.

203.    The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

204.    Plaintiff demands judgment against Defendants for all damages allowed by law, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Claim 5: Negligent Infliction of Emotional Distress

205.    Plaintiff realleges and incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

206. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its product used by Plaintiff.

207. Plaintiff was a foreseeable user of Defendants' product.

208. Defendants' product is distributed and sold to the public through retail channels (e.g., the Apple App "Store" and the Google Play "Store").

209. Defendants owed a heightened duty of care to young adult users of its product because young adult's brains are not fully developed, resulting in a diminished capacity to make responsible decisions regarding the frequency and intensity of social media usage.

210. Defendants breached their respective duty to Plaintiff by designing a defective product and failing to adequately warn about the risk of harm to young adults as described herein, including a risk of abuse, addiction, and compulsive use which can lead to a cascade of injuries. Those injuries include but are not limited to economic losses, dissociative behavior, withdrawal symptoms, social isolation, damage to self-worth, and profound mental health issues for young consumers including but not limited to depression, anxiety, suicidal ideation, self-harm, insomnia, death, and other harmful effects.

211. Defendants' product is dangerous, to an extent beyond that contemplated by the ordinary user who used Defendants' product, because it encourages unhealthy, addictive engagement and compulsive use.

212. Defendants knew or, by the exercise of reasonable care, should have known that their product posed risks of harm to young adults considering its own internal data and knowledge regarding its product at the time of development, design, marketing, promotion, advertising, and distribution.

213. Defendants' product is defective and unreasonably dangerous because, among other reasons described herein, Defendants failed to exercise reasonable care to inform users that, among other things:

f.  Defendants' product causes addiction, compulsive use, and/or other concomitant physical and mental injuries;

g.  Defendants' product harvests and utilizes user data in such a way that increases a user's risk of addiction to these product and concomitant physical and mental injuries;

h.  The algorithmically-targeted feeds in Defendants' product are designed to promote increasingly stimulative content to encourage compulsive engagement by the user, raising the risk of economic loss and mental health harms including but not limited to depression, self-harm, and suicidal ideation;

i.  New users of Defendants' product can begin to use the product, and do so indefinitely, without any time or usage limitations, without ever receiving a safety warning; and

j.  The likelihood and intensity of these harmful effects is exacerbated by the interaction of each product's features with one another, and by algorithms and other source code design that is currently publicly unknown and hidden from the users and the government.

214. Ordinary users would not have recognized the potential risks of Defendants' product when used in a manner reasonably foreseeable to the Defendant.

215. The Defendants' failures to adequately warn Plaintiff about the risks of its defective product was a proximate cause and a substantial factor in the injuries sustained by Plaintiff.

216. The nature of the safety concerns for Plaintiff are not the type of risks that are immediately apparent from using Defendants' product. When Plaintiff used Defendants' product, he could not independently verify whether Defendants' product posed an unreasonable risk or rely on Defendants' representations in the future.

217. The conduct of Defendants, as described above, was intentional, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of their customers, and warrants an award of punitive damages in an amount sufficient to punish Defendants and deter others from like conduct.

218. Plaintiff demands judgment against Defendants for all damages allowed by law, including compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Claim 6: Unjust Enrichment

219. Plaintiff incorporates by reference the above paragraphs as if set forth herein.

220. At all relevant times, Defendants designed, developed, managed, operated, tested, produced, labeled, marketed, advertised, promoted, controlled, sold, supplied, distributed, and benefitted from its product used by Plaintiff.

221. Plaintiff used Defendants' product in the manner in which Defendants' intended it to be used.

222. Through Plaintiff's use of the product, Defendants received significant benefit in terms of revenue and profit from Plaintiff's wagers and, ultimately, the addiction caused by Defendants' product.

223. As a result of the conduct and actions described herein, Plaintiff lost significant sums of money, as well as other forms of economic loss. These losses, and Defendants' retention of such sums, are a detriment to Plaintiff.

224. Defendants were unjustly enriched and have inappropriately retained that enrichment to this day.

225. Plaintiff demands judgment against Defendants for restitution and all equitable remedies available by law, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## PRAYER FOR RELIEF

Plaintiff respectfully prays for the following relief:

A. Enter judgment in Plaintiff's favor on each claim;

B. Award Plaintiff compensatory damages for each of the following categories of harm:

    a. Medical expenses (including expenses for hospitalizations and medical treatment);

    b. Pain and suffering;

    c. Mental anguish, anxiety, and discomfort;

    d. Loss of enjoyment of life;

    e. Emotional distress; and

    f. Other economic harm including but not limited to:

        a Lost earnings; and

b   Loss of earning capacity

C.   Award Plaintiff restitution and equitable relief as allowed by law;

D.   Award Plaintiff pre- and post-judgement damages;

E.   Award exemplary and punitive damages;

F.   Award reasonable and necessary attorneys' fees, costs, and expenses, of suit

along with pre-judgment interest on those sums; and

G.   Award such other relief to which Plaintiff may be justly entitled.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  June 24, 2026

Respectfully submitted,

/s/ Edward A. Wallace

Edward A. Wallace
Timothy E. Jackson
**WALLACE MILLER**
200 W. Madison St., Suite 3400
Chicago, IL 60606
T. (312) 261-6193
F. (312) 275-8174
E: eaw@wallacemiller.com
E: tej@wallacemiller.com

Yvonne M. Flaherty (MN #267600)
Aaron M. Hove (MN #0403612)
**Lockridge Grindal Nauen PLLP**
100 Washington Avenue South, Suite 2200
Minneapolis  MN 55401
Telephone: 612-339-6900
Facsimile:  612-339-0981
Email:  ymflaherty@Locklaw.com;
amhove@locklaw.com

Amanda M. Williams (MN #0341691)
**BASSFORD REMELE P.A.**
100 South Fifth Street, Suite 1500
Minneapolis, MN 55402
Telephone: (612) 333-3000
Facsimile: (612) 333-8829
Email: awilliams@bassford.com

Richard M. Paul III
Ashlea G. Schwarz
**Paul LLP**
600 Broadway Boulevard, Suite 600
Kansas City, Missouri 64105
Phone: (816) 984-8100
Email:  Rick@PaulLLP.com;
Ashlea@PaulLLP.com

**Attorneys for Plaintiff**

48